[L.A. No. 29930. In Bank. Sept. 11, 1972.]

MARIA TERESA BARENO, Plaintiff and Appellant, v.
EMPLOYERS LIFE INSURANCE COMPANY OF WAUSAU et al.,
Defendants and Respondents.

**COUNSEL**

Schall, Butler, Boudreau, Gore & Stutz, Schall, Butler, Boudreau & Gore and W. J. Schall for Plaintiff and Appellant.

Coyle & Dunford, Richard B. Coyle and Henry F. Walker for Defendants and Respondents.

## OPINION

**TOBRINER, J.**—We must adjudicate another case involving ambiguous provisions in a certificate of insurance issued pursuant to a group insurance policy. On countless occasions we have inveighed against the careless draftsmanship of documents of insurance and have decried the evil social consequences that flow from lack of clarity. (E.g., *Paramount Properties Co.* v. *Transamerica Title Ins. Co.* (1970) 1 Cal.3d 562, 569-570 [83 Cal.Rptr. 394, 463 P.2d 746]; *Gray* v. *Zurich Insurance Co.* (1966) 65 Cal.2d 263, 269-274 [54 Cal.Rptr. 104, 419 P.2d 168]; *Ensign* v. *Pacific Mut. Life Ins. Co.* (1957) 47 Cal.2d 884, 888 [306 P.2d 448]; *Continental Cas. Co.* v. *Phoenix Constr. Co.* (1956) 46 Cal.2d 423, 437-438 [296 P.2d 801].) We have emphasized that the uncertain clause leaves in its murky wake not only the disillusioned insured and the protesting insurer but also the anguished court.

We think that the responsibility for writing clear and simple policies lies with the insurance industry, and that the tremendous growth of insurance in this country enhances the need for such policies. The group insurance program, such as that presented here, a nation-wide development involving millions of customers,[1] increases the importance of precision; these multitudes of insured persons and their beneficiaries, many of whom are unversed in the sophisticated ways of commerce, are utterly unable to decipher obscure and technical language. They are singularly dependent upon the good will and the good draftsmanship of the insurer.

These considerations of public policy have long led courts to insist that insurers draw clear policies or suffer adverse consequences; we have consistently held that ambiguities in such documents must be resolved against the insurer. (*Gray* v. *Zurich Insurance Co.* (1966) 65 Cal.2d 263, 269 [54 Cal.Rptr. 104, 419 P.2d 168]; *Continental Cas. Co.* v. *Phoenix Constr. Co.* (1956) 46 Cal.2d 423, 437-438 [296 P.2d 801]; accord, Civ. Code, § 1654.)

---

[1] At the end of 1970, $545 billion worth of group life insurance was in force in the United States; this sum represented 39 percent of all life insurance coverage. Sixty billion dollars of this group life insurance was held by Californians; in this state the number of group life certificates actually exceeded the number of individual life policies.

Without question group insurance represents the most rapidly expanding segment of the life insurance industry. While the amount of individual life insurance in force has increased tenfold in the three decades between 1940 and 1970, group life insurance has increased more than *thirtyfold* from its 1940 level of $14 billion of coverage; other types of coverage have remained at a relatively constant level.

Source: Institute of Life Insurance, 1971 Life Insurance Fact Book, pages 22, 27, 29.

In the instant case we must interpret a group life and permanent disability insurance certificate and a notice of "terminated Employees' Options" issued to plaintiff's deceased husband. The basic question that lies before us turns on whether the certificate's 31-day extension provisions apply to the disability benefits in the policy or merely to the life insurance benefits. We conclude that the certificate and the separate notice of terminated employee's options extend the life and disability program for the 31-day period; we further conclude that even absent the notice we would nonetheless be compelled to infer from the certificate's ambiguous terms a 31-day extension for disability coverage. We return the case to the trial court to determine whether decedent became totally disabled during the 31-day period.

The uncontested facts are these: On January 6, 1967, Frederico G. Bareno commenced employment as a salesman of the Employers Mutual Liability Insurance Company. One month later he became eligible to, and did, enroll in the company's group life and permanent disability insurance program. At that time Bareno's employer provided him with an "employee certificate of insurance," which the insurer had prepared in order to set forth the provisions of the program. The certificate described both life insurance and permanent disability benefits.

In November 1967, Bareno began to develop heart trouble. On Christmas day of that year he experienced a serious convulsion, which required brief hospitalization. Within a week, after his doctors declared him fit to return to work, Bareno resumed his activities as a salesman. He did not notify the employing insurance carrier or his supervisor of the convulsive attack, but he did claim benefits under the carrier's group health plan for the expenses of treatment connected with that attack.

On February 1, 1968, Bareno's supervisor, receiving a copy of Bareno's claim for group health benefits, learned of his medical problems. The next day, February 2d, the supervisor informed Bareno that he was being discharged because of a "communication problem," namely, his failure to inform the company of his medical difficulties. In addition to this reason, another factor contributed to the decision to dismiss Bareno; he had not met the life insurance company's expectations for performance as a first-year salesman, obtaining only $5,000 of the $22,000 annual premium quota assigned to him.

In the days following his discharge Bareno completed the check-out procedures necessary to terminate his connection with the insurance company, and began to look for a new job. Two weeks after his notice of discharge, the company sent him his final paycheck, which included pay

for work up to February 2, two weeks' severance pay, and a deduction for Bareno's final group policy premium payment. The employer enclosed with the paycheck a notice of "terminated employee's options" under the company's group insurance programs.[2]

On February 19, the same day that the employer mailed the last paycheck and the notice, Bareno suffered an acute heart seizure. His doctor advised him to undergo immediate intensive hospital care, but because of his lack of funds Bareno refused. The doctor then ordered that Bareno at least rest quietly at home.

In the following weeks Bareno's health further deteriorated and became so poor that on the 12th of March his wife took him to the hospital. There the attending physician diagnosed Bareno's condition as terminal and ordered him into hospitalization. On March 13th, Bareno, then 36 years old, died of heart failure.

Following Bareno's death, his widow demanded indemnity from the

---

[2]The notice read in full as follows:

"TERMINATED EMPLOYEE'S OPTIONS UNDER EMPLOYERS INSURANCE
OF WAUSAU GROUP INSURANCE PROGRAMS"

"LIFE INSURANCE

"Cancelation—The insurance is continued, without further contribution, for 31 days after an employee is terminated; then is automatically canceled without notice.

"Conversion—An employee interested in converting all or part of his insurance may do so by contacting HO Life Underwriting. The written application and first premium payment must be submitted to the home office within 31 days after termination.

"No physical examination will be required regardless of condition.

"Rates will be those applicable to the individual at his age at the time of conversion.

"HEALTH INSURANCE AND ACCIDENTAL DEATH INSURANCE

"Cancelation—The insurance is canceled on the day an employee is terminated, with this exception:

"A female employee or wife or an employee will be entitled to maternity disability and obstetrical operation benefits if confinement occurs within nine months after termination of employment, provided she was insured for at least nine months before the termination occurred and pregnancy is medically determined to have commenced while she was insured.

"Conversion—Employees interested in converting to an individual policy may do so by written application made within 31 days after termination. Write HO Group Division for information.

"RETIREMENT PLAN

"Return of contributions—An employee enrolled in the retirement plan may have all of his contributions returned to him upon termination, plus 3% interest.

"Vested Retirement Benefit—You can elect a vested retirement benefit in lieu of a return of your contributions if your employment is terminated after age 40 and you have at least 10 years of credited service. The benefit would begin when you reach age 65 and it would be a proportion of the normal retirement benefit based on your credited service and final earnings at termination."

insurer in the amount of $40,000, which represented the value of the life insurance that Bareno held under the group policy. When the company refused to meet this demand, Mrs. Bareno brought the instant suit against her husband's insurer and his employer, alleging that the defendants were liable to her in contract on the policy and in tort for punitive damages.

At the close of the trial without jury, the superior court, on the basis of the following conclusions, held that Bareno was not covered under the policy: the extension provisions in the insurance certificate and notice mailed February 19 extended only the life insurance, and not the disability, portion of the policy for 31 days after Bareno's termination as an employee; the employer terminated Bareno's employment on February 2 for "reasons" that were "justified and proper"; Bareno did not die within 31 days of the termination of employment, and enjoyed no life insurance benefits under the policy; and since Bareno was not an employee on February 19 or March 13, he could not claim permanent disability benefits for disabilities experienced on either of those dates.

█ On this appeal plaintiff attacks the superior court's interpretation of the certificate and its ruling that the defendants were not liable under the policy.[3] Her contention raises an issue for the resolution of this court, since "it is the duty of the appellate court . . . to make its own independent determination of the meaning of the language used in the instrument under consideration." (*Schmidt* v. *Pacific Mut. Life Ins. Co.* (1969) 268 Cal.App.2d 735, 738 [74 Cal.Rptr. 367]; accord, *Faus* v. *City of Los Angeles* (1967) 67 Cal.2d 350, 360 [62 Cal.Rptr. 193, 431 P.2d 849]; *Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 865-866 [44 Cal.Rptr. 767, 402 P.2d 839].)

█ We begin by noting that rather than an analysis of the company's master policy both parties seek an interpretation of the insurer's certificate that the employer issued to Bareno. Whatever the purported coverage of the policy, "the terms of the certificate are binding on the insurer." (*Humphrey* v. *Equitable Life Assur. Soc.* (1967) 67 Cal.2d 527, 534 [63 Cal.Rptr. 50, 432 P.2d 746]; *Evans* v. *Holly Corp.* (1971) 15 Cal. App.3d 1020, 1023 [93 Cal.Rptr. 712]; *John Hancock Mut. Life Ins. Co.* v. *Dorman* (9th Cir. 1939) 108 F.2d 220; see 1 Appleman, Insurance Law & Practice (1965) § 46, at pp. 68-70.) "This result is easily justified

---

[3]Because plaintiff has not appealed the severable judgment against her tort claim for punitive damages, that judgment is now final against her. (See Code Civ. Proc., § 1908; Cal. Rules of Court, rule 2(a); *Hall* v. *Coyle* (1952) 38 Cal.2d 543, 546 [241 P.2d 236].) This appeal is thus necessarily limited to the contractual issue.

upon the grounds that the individual certificate is the only document which the employee sees or is given at any time and that the insurer, who drafts the instrument in language it selects, cannot thereafter complain that it does not express the intention of the parties." (*Humphrey* v. *Equitable Life Assur. Soc., supra,* at p. 534.) For this reason the court held in *Evans* v. *Holly Corp., supra,* "Where the representations in an insurance certificate indicate broader coverage than that provided by the master policy, the insurer is bound by the terms of the certificate." (15 Cal.App.3d at p. 1023.)

■ Thus, in order to determine liability we turn initially to the certificate. The provisions of the certificate as to termination are set out under the heading "Individual Terminations." The clause in substance provides that the coverage shall cease automatically upon either (1) the termination of the policy, (2) the cessation of premium payments, or (3) the termination of the employee's employment, and concludes as follows: "Note: In case the Employee ceases active work due to sickness, injury, retirement on pension, leave of absence or temporary layoff, the terms of the Group policy may provide for continuance of insurance for a limited period. The Employee should consult the Employer who is in a position to inform the Employee as to the terms of the policy in this respect."[4]

Pursuant to the "Individual Terminations" clause of the certificate, the employer on February 19 mailed the notice of "Terminated Employee's Options" set forth in footnote 2. The employer's notice provides that the "insurance is continued, without further contribution, for 31 days after an employee is terminated." Plaintiff contends that within 31 days after termination of Bareno's employment he became totally and permanently disabled, and was thus covered by the company's insurance program. The 31 days extended the policy until March 4th; Bareno claims that he was totally disabled as of that date and so remained until his death on March 13, 1968. We shall explain that Bareno could, indeed, reason-

---

[4]The provisions of the certificate as to termination read in full as follows:

"INDIVIDUAL TERMINATIONS: The insurance upon the life of the Employee under said Group Life Insurance policy shall cease automatically upon the occurrence of any of the following events: (a) the termination of the policy, (b) the cessation of premium payments on account of the Employee's insurance thereunder, (c) the termination of his employment in the classes of Employees insured thereunder.

Note: In case the Employee ceases active work due to sickness, injury, retirement on pension, leave of absence or temporary lay-off, the terms of the Group policy may provide for continuance of insurance for a limited period. The Employee should consult the Employer who is in a position to inform the Employee as to the terms of the policy in this respect."

ably believe that the policy continued for the 31 days after termination and that he was covered by it for total and permanent disability.

The certificate instructs the employee as to insurance termination to "consult the employer who is in a position to inform the employee as to the terms of the policy in this respect." No oral consultation occurred here; instead, the employer advised the employee of the terms of the policy by a *written* notification. In so informing Bareno, the employing insurance carrier evidently determined that he fell within the category of employees who, because of termination due to "sickness" or "injury," became eligible for the extension of their insurance benefits. Indeed, the notice itself was addressed to "terminated employees." The position of the employer that Bareno was a terminated employee entitled to the specified options becomes all the more unassailable when we remember that the employer itself was a life insurance company, presumably aware of the meaning of policy provisions.

Although the defendant insurance carrier argues now that the employee had not been "terminated" due to "sickness" or "injury" and should not have been sent the notice of terminated employee's options, we cannot accept this belated defense. First, as we have set forth above, the employing insurance carrier deliberately took the position that its employee should enjoy those options; second, the employing insurance carrier was designated to serve in the role of the insurer's administrator of the group insurance plan. The certificate itself named the employer as one who could inform the employee as to the terms of the policy; our cases have uniformly recognized that in this situation the employer acts as the agent of the insurer and that the insurer is bound by such agent's acts. (*Elfstrom* v. *New York Life Ins. Co.* (1967) 67 Cal.2d 503, 512-514 [63 Cal.Rptr. 35, 432 P.2d 731]; accord, *Pantzalas* v. *Superior Court* (1969) 272 Cal.App. 2d 499, 504 [77 Cal.Rptr. 354]; *John Hancock Mut. Life Ins. Co.* v. *Dorman* (9th Cir. 1939) 108 F.2d 220.)

The defendant insurance carrier, dissecting the language of the notice of terminated employee's options, seeks to constrict the notice's 31-day extension to life insurance only; we, believe, however, the reference is to the group insurance *program,* inclusive of the disability coverage. The very heading of the notice reads, "Terminated Employee's Options Under Employers Insurance of Wausau Group Insurance Programs." Those programs were apparently set forth in separate certificates, policies, or "plans": one program covered life insurance and disability insurance, another covered health and accidental death insurance, and a third covered retirement. The references to these specific programs in the notice itself took the form of subheadings: "Life Insurance," "Health Insurance and

Accidental Death Insurance," and "Retirement Plan." The term "Life Insurance" surely could reasonably be read to refer to the first of these programs: that is, the program covering life and disability insurance; the subheading could reasonably be understood to be a short-hand method of alluding to that program.

Moreover, the program for life and disability insurance as set forth in the certificate reads "Employee certificate of *insurance*" (italics added); the title of the certificate clearly does not exclude disability insurance. The content of the certificate contains one full page out of four devoted to "Total and Permanent Disability" and in other sections the life insurance and disability provisions are intertwined. The segregation of the two forms of protective insurance would involve cutting up the certificate into so many severed pieces; the company could hardly expect that Bareno would mentally execute any such gymnastics. By what alchemy was Bareno to be expected to distill the disability insurance from the life insurance? Bareno could reasonably believe that the notice's reference was, as its heading stated, to the "Insurance *program*," and that the subhead of "Life Insurance" did not exclude the disability provisions of that single program.[5]

Since the notice and certificate may be reasonably read to extend the permanent disability coverage, the insurer may not now seek refuge from extension in the ambiguity generated by its employer-agent in such agent's use of the "life insurance" heading in the notice of "terminated employees' options." (Civ. Code, § 1654; *Gray* v. *Zurich Insurance Co.* (1966) 65 Cal.2d 263, 269 [54 Cal.Rptr. 104, 419 P.2d 168]; *Continental Cas. Co.* v. *Phoenix Constr. Co.* (1956) 46 Cal.2d 423, 437-438 [296 P.2d 801].) On this basis we conclude that the employer's notice extended the permanent disability insurance until March 4, 1968, 31 days following Bareno's termination of employment.[6]

---

[5]Moreover, we believe that the disability benefit would be extended 31 days by this notice even if the notice were not read as specifically encompassing the disability coverage. As discussed in text *infra,* several clauses of the insurance certificate indicate that the disability benefit is to run concurrently with the life insurance coverage, and that the termination date of disability corresponds to the termination of the life insurance. Thus, even if the employer's notice is read as referring *only* to a 31-day extension of the life insurance benefit, under these provisions of the certificate coverage for disability would similarly be extended.

[6]The cases which defendants cite do not conflict with this conclusion. None of these cases interprets a group life and permanent disability policy which was accompanied with a certificate and notice worded as are those in the instant case. Moreover, in *Conger* v. *Travelers Ins. Co.* (1966) 266 N.C. 496 [146 S.E.2d 462], and *Kerlin* v. *Metropolitan Life Ins. Co.* (La.App. 1962) 141 So.2d 895, the beneficiary sought recovery on *life* insurance although the decedent died more than 31 days after his employment terminated; permanent disability was not even at issue. Similarly, the policy in *Funderburk* v. *Metropolitan Life Ins. Co.* (La.App. 1962) 146 So.2d 710,

Even if the employer had not provided an extension of the insurance in its "terminated employee's options" notice, however, we would be compelled merely on the basis of the certificate to conclude that the permanent disability insurance continued for 31 days after termination of Bareno's employment.

The certificate's "total and permanent disability" clauses provide that some of the disability benefits shall vest if the insured becomes totally and permanently disabled "prior to the termination of his *insurance* under the aforesaid policy and before attaining the age of sixty." The disability provisions also state that other benefits shall vest if the insured's disability comes "before cessation of his *insurance* in accordance with the provision hereof entitled 'Individual Terminations.' " Plainly, then, the certificate in these instances measures the duration of disability coverage by the termination of the other insurance provided for in the certificate—not by the termination of employment. Accordingly, the disability insurance runs in tandem with that of the other insurance—life insurance—described in the certificate; the permanent disability coverage continues concurrently with the life insurance.

The remaining clauses of the certificate, including the "individual terminations" provision, however, create an ambiguity in the designation of the termination date of the life insurance. The "individual terminations" clause declares flatly that "[t]he insurance upon the life of the Employee under said Group Life Insurance policy shall cease automatically upon the occurrence of . . . the termination of his *employment* in the classes of Employees insured thereunder." In contrast, the "extended death benefit" clause provides, as required by Insurance Code section 10209, that if "an Employee whose insurance under the Group policy terminated due to termination of employment in the class or classes of Employees insured thereunder, died within thirty-one days after such termination of employment, the Company will pay to the Employee's beneficiary the amount of insurance for which the Employee was last insured under the Group policy." This latter clause expressly extends the life insurance coverage for 31 days after the employee's termination.

---

overruled on other grounds, *Jefferson* v. *Jefferson* (La.App. 1963) 154 So.2d 645, *expressly* extended only life insurance; the court found *no* provision which could be read to extend accidental death benefits. Finally, although *Henderson* v. *Prudential Ins. Co.* (E.D.Mich. 1965) 238 F.Supp. 862 interpreted a certificate and notice that bear similarities to those in the instant case, the court in that case refused to find an extension of permanent disability benefits unless "clear language" to that effect appeared in the documents; we cannot adopt this "clear language" approach in view of our precedents which require that the insurer-draftsman, and not the insured, suffer from its failure to define the policy benefits with precision.

Thus the above "individual terminations" and "extended death benefit" clauses taken together reveal that the "individual terminations" clause may not mean what it says when it declares that the life insurance automatically ends upon the termination of employment; indeed, the "extended death benefit" clause seems to indicate that the life insurance *never* terminates on the employment termination date, but rather *always* continues for 31 days thereafter. Given that the "individual terminations" clause may be construed either to stand alone as an absolute declaration of immediate termination or as *always* conditioned by the language of the "extended death benefit" clause, we must again construe this ambiguity against the insurer-draftsman and in favor of the more extensive coverage. Accordingly, we conclude that the termination clauses in the certificate extend the life insurance for 31 days after the termination of employment. Since the certificate's permanent disability clauses extend that coverage to the termination date established for life insurance, the certificate similarly extends the disability coverage for the same 31-day period. Thus without even referring to the February 19 notice of terminated employee's options, which we have already read as extending Bareno's permanent disability until March 4, we find that the ambiguous terms of the certificate itself effectuate the same 31-day extension.

■ The trial court, however, concluded that the 31-day extension did not apply to permanent disability benefits because the disability provisions in the certificate refer to "the Employee" and Bareno was not an employee during the 31-day extension period. The context of the certificate, however, reveals that the trial court erred in seizing upon the literal meaning of the word "employee" to narrow the coverage of the policy. Reading the certificate as a whole, we find that throughout the document the insurer-draftsman has used the word "employee" to mean "the insured," regardless of his employment status.[7] Accordingly, the trial court erred in failing to conclude that Bareno's permanent disability insurance continued in effect until March 4, 1968.

Because Bareno's certificate of insurance provided benefits if he became totally and permanently disabled on or before March 4, the crucial question remains whether or not Bareno did become so disabled. ■ "According to overwhelming authority, the term 'total disability' does not signify an absolute state of helplessness but means such a disability as renders the

---

[7]For example, the "extended death benefit" clause provides coverage for "an Employee whose insurance under the Group policy terminated due to the termination of employment," and who "died within thirty-one days after such termination of employment." This clause expressly creates coverage for one who is labelled "an Employee" but is in fact no longer in that status.

insured unable to perform the substantial and material acts necessary to the prosecution of a business or occupation in the usual or customary way. Recovery is not precluded under a total disability provision because the insured is able to perform sporadic tasks, or give attention to simple or inconsequential details incident to the conduct of business." (*Erreca* v. *Western States Life Ins. Co.* (1942) 19 Cal.2d 388, 396 [121 P.2d 689, 141 A.L.R. 68].)

Plaintiff sought to establish that within the parameters of the standard of *Erreca* Bareno became totally disabled by March 4, 1968. Her evidence tended to show that Bareno could not remain out of bed for long periods of time; that he required the constant attendance of others to care for his basic personal needs; that he suffered from continual loss of sleep and inability to ingest food; that his doctor had prescribed intensive hospital care. The uncontroverted post-mortem medical analysis revealed that Bareno's heart condition, prior to the March 4 date, had become acute.

Despite this evidence and plaintiff's specific request to the trial court to find that Bareno was totally disabled on March 4, 1968, and so remained until his death on March 13, 1968, that court did not enter findings on Bareno's disability as of March 4 and dates following.[8] Accordingly, this cause must be remanded to the superior court for further findings as to Bareno's disability, which will establish or dispose of plaintiff's right to recovery under the provisions of the insurance certificate.[9]

---

[8]The trial court found that, except for facts relating to the date Bareno's employment was terminated, "each and all of the allegations set forth in Paragraph III of the alleged Second Cause of Action of Plaintiff's First Amended Complaint, are untrue." (C.T. p. 48.) In that Paragraph III plaintiff alleged that "[o]n or about *February 19, 1968* . . . decedent became totally disabled by disease and remained so disabled until his death on or about March 13, 1968." (C.T. p. 8, italics added.) Even though the trial court thus appears to have found that Bareno was not totally and permanently disabled as of February 19, it has not found, and is not foreclosed from finding, that Bareno had become totally and permanently disabled as of *March 4.*

[9]We observe that if Bareno had become totally disabled on or before March 4, and remained so until his death, his beneficiary would recover the full $40,000 face amount of the policy. Part A of the certificate, applying to the first $20,000 of life insurance, specifies that if an insured who is permanently disabled dies before payment of monthly disability installments, his beneficiary shall receive the amount of life insurance then in force. Since the insurer has made no installment payments under any of the policy provisions, and since Bareno died subsequent to his total and permanent disability, if any, plaintiff would be entitled to recover the full $20,000 of coverage under Part A.

Part B, relating to the remaining face amount of the life insurance, provides that if an insured becomes totally disabled prior to age 60, remains so until his death, and death occurs within one year after the discontinuance of premium payments for his life insurance, then his beneficiary shall receive that remaining face amount. Again, assuming a continuing disability as of March 4, Bareno's history conforms to these

 In sum, our study and analysis of the certificate and notice lead us to the conclusion that the language of the documents is at best ambiguous; as a consequence, the uncertain terminology must be construed against the insurer-draftsman. Not only does the responsibility for such imprecision lie initially with the carrier, but in the instant case the employer, a life insurance company itself, compounded the confusion by its unclear and uncertain notice of terminated employee's options. This court cannot assume the obligation of rescuing carriers from their own failure to write policies with precision and to administer them so as to avoid confusion.

The judgment of the superior court is reversed and the cause remanded for further proceedings consistent with this opinion.

Wright, C. J., Peters, J., Mosk, J., Burke, J., and Sullivan, J., concurred.

**McCOMB, J.**—I dissent. I would affirm the judgment for the reasons expressed by Mr. Justice Ault in the opinion prepared by him for the Court of Appeal, Fourth Appellate District, Division One (*Bareno* v. *Employers Life Insurance Company,* et al., 4 Civ. 10352, filed July 8, 1971, certified for nonpublication).

---

requirements. He died at age 36, as a consequence of a disability from which he did not recover; his death came one month after his final premium payment, well within the one-year limitation. Accordingly, plaintiff would recover the $20,000 of remaining coverage under Part B.