[Civ. No. 21977. Third Dist. Apr. 14, 1983.]

BRETT WILSON, a Minor, etc., et al., Plaintiffs and Respondents, v. KAISER FOUNDATION HOSPITALS et al., Defendants and Appellants.

**COUNSEL**

Thelen, Marrin, Johnson & Bridges, T. Emmet Thornton, Curtis A. Cole, Arthur P. Morello, Jr., Geoffrey D. Minott, Craddick, Candland & Conti and Richard Conti for Defendants and Appellants.

Klein & deVries and Douglas K. deVries for Plaintiffs and Respondents.

**OPINION**

**SPARKS, J.**—The question to be decided is whether a binding arbitration clause in a group medical and hospital agreement governs a claim for prenatal injuries by a child who, while not a member of the group at the time of medical malpractice, becomes one at the moment of his birth.

Defendants Kaiser Foundation Hospitals (Hospitals) and Permanente Medical Group (Permanente) appeal from an order denying enforcement of an arbitration provision in a medical services contract to plaintiff's cause of action for prenatal injuries.[1] We hold that the arbitration clause is binding upon plaintiff and shall reverse.

Plaintiff Brett Wilson, son of Ruth and Michael Wilson, was born at a Kaiser Hospital on February 26, 1981. His mother, Ruth, was employed by Permanente as a clinical assistant. By virtue of her employment Ruth became eligible for health care benefits under the Kaiser Foundation Health Plan (Health Plan). The Health Plan is a nonprofit California corporation in the business of operating a prepaid service plan for the rendition of medical and hospital services to its subscribers and members. It contracts with defendant Permanente for medical services and with defendant Hospitals for hospital services to its

---

[1] The order is appealable. (Code Civ. Proc., § 1294, subd. (a); *Madden* v. *Kaiser Foundation Hospitals* (1976) 17 Cal.3d 699, 705, fn. 4 [131 Cal.Rptr. 882, 552 P.2d 1178].)

members.[2] Effective January 1, 1979, Permanente entered into a separate contract with Health Plan entitled, "Group Medical and Hospital Service Agreement." Under the terms of that agreement Health Plan agrees to arrange for specified hospital and medical services for eligible individuals enrolled in a Permanente group. The agreement contains a provision requiring arbitration of all medical malpractice disputes. The arbitration clause provides: "Any claim arising from alleged violation of a legal duty incident to this Agreement shall be submitted to binding arbitration if the claim is asserted: [¶] (1) By a Member, or by a Member's heir or personal representative ('Claimant'); [¶] (2) On account of death, mental disturbance or bodily injury arising from rendition or failure to render services under this Agreement, irrespective of the legal theory upon which the claim is asserted; . . ."

Ruth enrolled herself and her family under this agreement on June 1, 1979, and thus became a subscriber and member of the Health Plan. Since Ruth had previously selected the Health Plan's prepaid medical coverage for herself and her family, she sought defendants' services for the delivery of plaintiff. Four months later, in June 1981, after returning to work following her maternity leave-of-absence, Ruth formally enrolled plaintiff as a family dependent member of the group plan.[3]

In September 1981 plaintiff, through Ruth as his guardian ad litem, and his parents jointly filed a complaint for personal injuries. The complaint alleged plaintiff sustained perinatal injuries (i.e., injuries sustained shortly before and after birth) through the negligence of defendants. Plaintiff sought compensation for epilepsy, brain damage and other undefined injuries. Plaintiff's parents sought damages for his future care and for their own emotional distress.

In turn, defendants filed a petition to compel arbitration and a motion to stay the action. (Code Civ. Proc., §§ 1281.2; 1281.4.) Plaintiff opposed the petition, asserting he was not a "member" under the terms of the agreement either at the time of his injuries or at the time of his birth. Plaintiff also asserted that

---

[2]The relationship between the Health Plan and both Permanente and Hospitals is described in the agreement as an "independent contractor relationship."

[3]Ruth did so by signing a form on his behalf which contained the following language:
"I apply for Health Plan membership for the persons listed and agree that we shall abide by the provisions of the Service Agreement and Health Plan regulations. I understand that as a part of my membership the Health Plan Service Agreement requires that any monetary claim asserted by a Member or the Member's heirs or personal representatives on account of bodily injury, mental disturbance or death must be submitted to binding arbitration instead of a court trial."
A "member" is defined as any subscriber or family dependent. A family dependent, in turn, is defined as "Any person who meets all applicable eligibility requirements . . . and is enrolled hereunder, and for when the prepayment required . . . has been received by Health Plan." As a newborn child of a subscriber, plaintiff met all the eligibility requirements under the plan and became a member upon enrollment.

since the agreement does not expressly and unambiguously provide for arbitration of perinatal injuries, the action was properly filed in superior court.

Following hearing and argument, the trial court entered its order granting the petition as it applied to plaintiff's claim of postnatal negligence and also ruled plaintiff's parents' claims must be arbitrated. The court, however, denied the petition as to plaintiff's claim of prenatal negligence.

A reading of the court's findings of fact and conclusions of law indicates the basis for the court's reasoning. The court determined plaintiff was not automatically a member of the Health Plan at the time of birth and that subsequent enrollment was necessary to make plaintiff a member. The court impliedly found, however, that Ruth's enrollment of plaintiff in June 1981 had the effect of retroactively making plaintiff a member as of the time of birth under the provisions of the agreement. Therefore, the court concluded all claims arising at or after plaintiff's birth were required to be arbitrated. The court also ruled, however, the agreement does not expressly provide for arbitration of claims relating to prenatal negligence and that any such claim was not subject to arbitration. Thus, while the complaint alleges negligence commencing when Ruth experienced difficulty during labor and continuing through the delivery of plaintiff, the effect of the trial court's order is that plaintiff may now litigate in superior court his claim of prenatal (i.e., prebirth) negligence.

## DISCUSSION

The focal point of our analysis must be on the relevant provisions of the agreement. ■ In this regard we note that as the underlying facts are not in dispute, " 'it is the duty of the appellate court . . . to make its own independent determination of the meaning of the language used in the instrument[s] under consideration.' [Citations.]" (*Bareno* v. *Employers Life Ins. Co.* (1972) 7 Cal.3d 875, 881 [103 Cal.Rptr. 865, 500 P.2d 889].)

■ It is uncontroverted that the agreement provides for arbitration of all claims arising out of or incident to the rendition or failure to render services under it, and that the agreement was in effect throughout the period alleged in the complaint. Our review of the agreement persuades us that plaintiff was automatically enrolled as a member at the time of his birth in accordance with the provisions of Health and Safety Code section 1373, subdivision (c). The agreement provides that the Health Plan "is subject to the requirements of Chapter 2.2 of Division 2 of the California Health and Safety Code and of Subchapter 5.5 of Chapter 3 of Title 10 of the California Administrative Code, and any provision required to be in this Service Agreement by either of the above shall bind Health Plan whether or not set forth herein." Health and Safety Code section 1373, subdivision (c), a part of that chapter, provides in relevant part: "Every plan contract which provides coverage to family members or depen-

dents of the subscriber or enrollee shall grant immediate accident and sickness coverage, from and after the moment of birth, to each newborn infant, . . . No such plan may be entered into or amended if it contains any disclaimer, waiver, or other limitation of coverage relative to the coverage or insurability of newborn infants of a subscriber or enrollee covered from and after the moment of birth . . . ." This construction of the agreement comports with the implementing procedure inaugurated by the Health Plan. In May 1980 the Health Plan announced that "[b]eginning July 1, 1980 Kaiser Foundation Health Plan will implement a new procedure to automatically enroll newborn children delivered in Kaiser Foundation Hospitals. . . . If the employee does not want to enroll an eligible newborn, he or she will be required to go to a Health Plan office to complete a form to stop the enrollment process."

Although the trial court determined plaintiff was not automatically enrolled upon birth, its error was harmless in light of its finding that Ruth's subsequent enrollment of plaintiff in June 1981 was retroactive to the time of birth.[4] Therefore, under either our interpretation of the agreement or the interpretation of the trial court, the conclusion is the same: that plaintiff was a member of the Health Plan as of the time of birth, and all claims asserted by plaintiff regarding birth and postbirth services rendered by defendants were properly ordered into arbitration.

■ We turn to the crucial issue presented in this appeal: whether plaintiff is also required to arbitrate his claim of prenatal negligence.

Plaintiff contends that even if he were a member upon birth, he was not "alive" and thus not a member when injuries were suffered while a fetus. Moreover, plaintiff notes the agreement provides for coverage ";from birth," and does not specifically provide for the arbitration of "prebirth" or "prenatal" injuries. Plaintiff argues that the injuries suffered prior to his birth, and thus prior to his membership in the Health Plan, need not be submitted to arbitration. We disagree.

At the time of the negligent infliction of the prenatal injuries plaintiff, as a fetus, accrued no right of action against the wrongdoer. "At common law," the court recounted in *Scott* v. *McPheeters* (1939) 33 Cal.App.2d 629, 632 [92 P.2d 678, 93 P.2d 562], "the weight of authority holds that an unborn child, in contemplation of law, has no existence as a human being separate from its mother, and that it therefore has no right of action for personal injuries inflicted upon it prior to its birth, by the wrongful conduct of another." (See generally, Annot., Liability for Prenatal Injuries (1971) 40 A.L.R.3d 1222.) By the enact-

---

[4]The agreement expressly provides that: "An eligible and enrolled newborn child is covered from birth . . . ." (§ 2(C)(1).)

ment of Civil Code section 29,[5] California rejected the common law rule and created a new cause of action for prenatal injuries by a child who survives those injuries and is born alive. (*Norman* v. *Murphy* (1954) 124 Cal.App.2d 95, 98 [268 P.2d 178]; *Scott* v. *McPheeters, supra,* 33 Cal.App.2d at pp. 632-633.)[6] The weight of the common law has now completely shifted and all American jurisdictions permit a tort action to be maintained to recover damages for prenatal injuries negligently inflicted if the injured child is born alive. (Rest.2d, Torts (Appen.) § 869, reporter's note, p. 79.) But if the injured child is not born alive a cause of action does not arise on its behalf because a stillborn fetus is not a person within the meaning of the California wrongful death statute. (*Justus* v. *Atchison* (1977) 19 Cal.3d 564 [139 Cal.Rptr. 97, 565 P.2d 122]; see generally, Annot., Action for Death of Unborn Child (1978) 84 A.L.R.3d 411.) The Second Restatement of Torts takes a similar position, asserting that if one tortiously causes harm to an unborn child who is not born alive, "there is no liability unless the applicable wrongful death statute so provides." (Rest.2d Torts, § 869, subd. (2).) In its comment to that subsection, the restatement notes that "[i]f the child is not born alive, no action for the prenatal injury can be maintained by the child itself, since, although it has had a legal existence, it never has attained the status of a person entitled to maintain an action." (Rest.2d Torts, § 869, com. e, p. 277.)

The California Supreme Court has similarly recognized that "cases holding that a child can recover for injuries caused before his birth require that the child be born alive. The interest protected is that of the child; and the right attaches, not to the embryo or fetus, but to the living child. (*Scott* v. *McPheeters*, 33 Cal.App.2d 629, 637 [92 P.2d 678, 93 P.2d 562] [child injured at birth can bring action for injuries]; see also, *Carroll* v. *Skloff* (1964) 415 Pa. 47 [202

---

[5]Civil Code section 29 provides, in pertinent part: "A child conceived, but not yet born, is to be deemed an existing person, so far as may be necessary for its interests in the event of its subsequent birth; . . ." Under the terms of this section, birth (i.e., being born alive) is a condition precedent to the accrual of the child's rights; it is the condition precedent which must occur before legally cognizable rights accrue to an unborn child. (See Civ. Code, §§ 708; 1436.) As the Supreme Court noted in *People* v. *Belous* (1969) 71 Cal.2d 954, 968, footnote 12 [80 Cal.Rptr. 354, 458 P.2d 194], "Statutes classifying the unborn child as the same as the born child require that the child be born alive for the provisions to apply. (E.g., Civ. Code, § 29 ['A child conceived, but not yet born, is to be deemed an existing person, so far as may be necessary for its interests in the event of its subsequent birth; . . .'] . . . ."

The trial court, therefore, correctly concluded that "[p]rior to actual birth, the fetus is, under tort law, a non person . . . ." It is the logical implication of that conclusion that the lower court misapprehended.

[6]But California continued to follow the common law rule for crimes. Thus the destruction of an unborn but viable fetus did not constitute murder because a fetus was not a "human being" within the meaning of the murder statute. (*Keeler* v. *Superior Court* (1970) 2 Cal.3d 619 [87 Cal.Rptr. 481, 470 P.2d 617, 40 A.L.R.3d 420].) Legislative reaction to that case brought about the amendment of Penal Code section 187 redefining murder as "the unlawful killing of a human being, or a fetus, with malice aforethought." (Stats. 1970, ch. 1311, p. 2440; see also *People* v. *Smith* (1976) 59 Cal.App.3d 751 [129 Cal.Rptr. 498].)

A.2d 9, 11]; *Tomlin* v. *Laws* (1922) 301 Ill. 616 [134 N.Ed.2d 24, 25]; Prosser, Law of Torts (3d ed. 1964) at p. 356 ['The child, provided that he is born alive, is permitted to maintain an action. . . .'].) [¶] Where the embryo or fetus is allowed to assert rights before birth it is the prospective mother or parents who are bringing the action; thus it is their interest that the law protects. (*Kyne* v. *Kyne*, 38 Cal.App.2d 122, 127-128 [100 P.2d 806] [action on behalf of unborn child for support and to establish paternity]; *People* v. *Sianes*, 134 Cal.App. 355, 357-358 [25 P.2d 487] [Criminal action for nonsupport against father of unborn child;] *People* v. *Yates*, 114 Cal.App.Supp. 782, 786 [198 P. 961] [same].)" (*People* v. *Belous, supra,* 71 Cal.2d at p. 968, fn. 12.)

Plaintiff seeks to assert a right to the benefits under the agreement but to avoid the consequences which attach to the acceptance of benefits, i.e., submission to arbitration of claims arising out of services rendered. Yet, for plaintiff to assert that he was not alive at this time (and thus, so the argument goes, not a member bound by the arbitration provisions), ignores the fact that *Ruth* sought obstetric care from defendants pursuant to her membership in the Health Plan, and upon so doing, she elected and expected medical services for both herself *and her unborn child*. Since the agreement under which medical services were rendered provided for prenatal care to Ruth *and* to her unborn child, all such care was rendered subject to the agreement.

The arbitration clause is not limited to claims for services rendered to members; instead it applies to all claims for "bodily injury arising from rendition or failure to render services under this Agreement, . . ." The prenatal services rendered to Ruth which allegedly injured plaintiff were indisputably performed under the agreement. Plaintiffs' cause of action for prenatal malpractice is therefore a "claim" for bodily injury arising from the rendition or failure to render services under the agreement even though he was not a member at the time of their rendition. That cause of action arose only at his birth and at that moment he became a member of the Health Plan. Consequently it is a claim asserted by a member which, under the agreement, "shall be submitted to binding arbitration." In short, plaintiff never had a legally recognizable claim before he was a member of the Health Plan.

Plaintiff is bound by the terms of the Health Plan selected by his mother. Ruth indisputably had the legal authority to contract for medical care for her unborn child and to bind him to arbitration. In *Doyle* v. *Giuliucci* (1965) 62 Cal.2d 606 [43 Cal.Rptr. 697, 401 P.2d 1], the father of an injured minor entered into a contract with a medical group which provided for arbitration of tort and contract claims arising under the contract. The court held the minor was bound by the agreement to submit her malpractice claim to arbitration. "[T]he power to enter into a contract for medical care that binds the child to arbitrate any dispute arising thereunder is implicit in a parent's right and duty to

provide for the care of his child. [Citations.] There are compelling reasons for recognizing that power. Since minors can usually disaffirm their own contracts to pay for medical services (Civ. Code, §§ 35, 36), it is unlikely that medical groups would contract directly with them. They can be assured the benefits of group medical service only if parents can contract on their behalf." (*Id.*, at p. 610.)

Here, the election by Ruth to receive obstetric care from defendants and to accept Health Plan membership for plaintiff in accordance with the terms of the agreement constitutes the same kind of election as was made on behalf of the child plaintiff in *Doyle*. Indeed, we do not believe *Doyle* can be distinguished simply because this case involves a parent impliedly contracting on behalf of an unborn child instead of an already born child. The logic of identical treatment for the unborn child and the already born child is evident since neither a fetus nor a minor has capacity to contract for the necessary medical services on his or her own behalf, and must do so through an authorized representative, such as a parent. And, whether a parent makes an election for the receipt of medical services on behalf of an unborn or already born child, such election must be binding regarding the terms of agreement pursuant to which the services were rendered.[7]

Plaintiff's reliance on *Weeks* v. *Crow* (1980) 113 Cal.App.3d 350 [169 Cal.Rptr. 830], is misplaced. *Weeks* involved an action by parents for the wrongful death of their minor child who, according to the complaint, died a few days after birth due to the negligence of defendants during delivery. Upon entering the hospital prior to delivery, plaintiffs signed an admission agreement providing for arbitration of any dispute related to the medical treatment of a patient. Only the plaintiff mother was named as a "patient" under the agreement. The *Weeks* court held the plaintiffs did not agree to arbitrate claims of malpractice in the care and treatment *of the baby*. The court emphasized that the arbitration agreement contained no reference to the expected child and that only the expectant mother was named as the patient. "The omission of any reference to the child," the *Weeks* court concluded, "expresses an intention not to apply the Agreement to malpractice claims arising out of medical services rendered to the child." (113 Cal.App.3d at p. 353.)

*Weeks* is distinguishable. The arbitration provision in *Weeks* was not contained in a comprehensive, prepaid family health care contract; rather, it was found in a blanket admission agreement provided by a fee for a service health

---

[7]It must be noted that section 10, subsection (B), of the agreement provides in part: "By electing medical and hospital coverage pursuant to this Agreement, *or accepting benefits hereunder,* all Members legally capable of contracting, *and the legal representatives of all Members incapable of contracting,* agree to all terms, conditions and provisions hereof." (Italics added.)

care provider. (See 113 Cal.App.3d at p. 352.) That admission contract did not purport, nor did the parties intend, to compel arbitration of "disputes arising out of the treatment of persons other than the named patient." (*Id.*, at p. 354; cf. also *Rhodes* v. *California Hospital Medical Center* (1978) 76 Cal.App.3d 606, 609-610 [143 Cal.Rptr. 59].)

Here, the arbitration provision is contained in a comprehensive, prepaid health care agreement intended to cover the entire family. Unlike the admission agreement in *Weeks,* the Health Plan here specifically contemplates the addition or inclusion of third parties, including newborn children, and it is clear plaintiff's mother, pursuant to the terms of the agreement, expected coverage for plaintiff, even prior to his birth. The agreement here contemplates that all claims by members, including newborn members, shall be subject to arbitration.

The judgment (order) is reversed.

Evans, Acting P. J., and Blease, J., concurred.

A petition for a rehearing was denied May 11, 1983, and respondents' petition for a hearing by the Supreme Court was denied July 13, 1983. Bird, C. J., was of the opinion that the petition should be granted.