**GENESIS INS. CO., Plaintiff,**

v.

**BRE PROPERTIES, et al., Defendants.**

No. C –12–00368 EDL.

United States District Court,
N.D. California.

Jan. 3, 2013.

Stephen David Treuer, Alan H. Barbanel, Nancy Joy Brown, Barbanel & Treuer, P.C., Los Angeles, CA, for Plaintiff.

Thomas Edward Gibbs, Brian Robert Bauer, Allen Matkins Leck Gamble Mallory & Natsis LLP, Irvine, CA, David C. Capell, Donald J. Verfurth, Shannon Wodnik, Gordon & Rees LLP, Seattle, WA, for Defendants.

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANT BRE PROPERTIES, GRANTING DEFENDANT LEXINGTON'S MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANT BRE PROPERTIES, AND DENYING DEFENDANT BRE PROPERTIES' MOTIONS FOR SUMMARY JUDGMENT AGAINST PLAINTIFF AND DEFENDANT LEXINGTON**

ELIZABETH D. LAPORTE, United States Magistrate Judge.

In this insurance coverage action, the parties have filed four summary judgment motions. For the reasons stated at the December 18, 2012 hearing and in this Order, Plaintiff's Motion for Summary Judgment against Defendant BRE Properties is granted, Defendant Lexington Insurance Company's Motion for Summary Judgment against Defendant BRE Properties is granted, and Defendant BRE Properties' Motions for Summary Judgment

against Plaintiff and Defendant Lexington are denied.

## Background

Defendant BRE alleges that it "is in the business of acquiring, developing, operating and selling apartment communities." Counterclaim (docket 9) at ¶ 7. In 1996, BRE purchased Berkshire Court, a group of 26 apartment buildings in Oregon. Counterclaim (docket 9) at ¶¶ 9–10. The apartments were occupied or held for rent or rented by BRE. Treuer Decl. Ex. C at 32. BRE collected annual rents of approximately $2,000,000 for the 266 Berkshire units. Treuer Decl. Ex. D.

After it purchased Berkshire, BRE discovered water intrusion and damage in the areas of the project's balconies and siding, and hired American Building & Property Maintenance & Construction Company ("ABC") as the general contractor to make the repairs. Treuer Decl. Ex. E at ¶ 3. The repair work occurred between 1999 and 2001 and included the replacement of exterior unit decks and siding, and the repair of all property damage. Treuer Decl. Ex. E at ¶¶ 3–4.

Beginning in October 1999, BRE purchased a series of comprehensive general liability ("CGL") insurance policies from Plaintiff Genesis. Treuer Decl. Ex. S, T, U. The last Genesis policy was in effect from October 31, 2001 to October 31, 2002. Treuer Decl. Ex. U. Defendant Lexington issued six consecutive Commercial General Liability policies to BRE that were in effect from October 31, 2002 to October 31, 2008. Wodnik Decl. Ex. G–L.

In 2003, BRE sold Berkshire to Oakmont, LLC and others. Treuer Decl. Ex. A at ¶ 11. On November 21, 2008, Oakmont sued BRE and others, including BRE's general contractor, ABC, in the *Oakmont Actions* in state court in Oregon (*Oakmont I*). Treuer Decl. Ex. A at ¶ 12. Oakmont alleged that: (1) ABC performed inadequate repairs to Berkshire between 1999 and 2001; (2) BRE directed and authorized the repairs; (3) BRE misrepresented the condition of Berkshire and failed to disclose defects; and (4) BRE sold Berkshire to Oakmont on February 18, 2003. Treuer Decl. Ex. E. Oakmont asserted claims against BRE for negligence and misrepresentation. Treuer Decl. Ex. E at 9–10. Oakmont alleged that BRE was negligent in failing to properly maintain, investigate and repair the construction defects and other related property damage. Treuer Decl. Ex. E at 10. Oakmont alleged that BRE misrepresented facts to Oakmont, including failing to disclose defects and stating that the property defects were properly repaired. Treuer Decl. Ex. E at 10–11.

BRE moved to dismiss Oakmont's claims against it, and on March 16, 2009, the state court granted BRE's motion with leave to amend. Treuer Decl. Ex. G. On July 27, 2009, Oakmont and BRE stipulated to a dismissal of BRE without prejudice. Treuer Decl. Ex. H. BRE litigated this case without tendering the defense to Genesis because the Genesis policies contained a Self–Insured Retained Endorsement with a retained limit of $50,000. Treuer Decl. Ex. S, T, U. Lexington's policies also had a Self–Insured Retention Endorsement with a retained limit of $200,000. Wodnik Decl. Ex. G–L.

In early 2010, BRE provided notice of the 2008 lawsuit to Lexington. Gibbs Decl. ¶¶ 2, 3, 16, 23, Ex. A, B, U. Lexington responded with an acknowledgment of the litigation, which BRE argues conceded coverage: "The purpose of this letter is to confirm the liability coverage afforded BRE." Gibbs Decl. ¶¶ 2, 3, 16, 24, Ex. A, B, V. BRE argues that it kept Lexington apprised of the litigation and advised it that BRE was about to reach the Retained Limit stated in the policy, after which Lexington would have to pay for BRE's de-

fense. Gibbs Decl. ¶¶ 2, 3, 16, 25, 26. Ex. A, B, W, X.

On March 22, 2010, ABC filed a second amended third party complaint against BRE for indemnity and contribution in *Oakmont I* in Oregon state court. Treuer Decl. Ex. I. ABC alleged that its liability to Oakmont arose, if at all, because BRE negligently defined the scope of work for the project, and negligently supervised and managed it. Treuer Decl. Ex. I at ¶ 18. BRE moved to dismiss ABC's claim, and on July 22, 2010, the state court dismissed ABC's complaint against BRE with leave to amend. Treuer Decl. Ex. K. ABC did not file an amended complaint. Treuer Decl. Ex. B.

On December 8, 2010, Oakmont filed a complaint for misrepresentation against BRE in Oregon state court (*Oakmont II*). Treuer Decl. Ex. L. BRE filed a motion to dismiss, arguing that *Oakmont I* was still pending, and on June 7, 2011, *Oakmont II* was dismissed without prejudice. Treuer Decl. Ex. N.

On October 6, 2011, the Oregon state court in *Oakmont I* granted Oakmont's motion to file a third amended complaint. Treuer Decl. Ex. P. The third amended complaint alleges a single claim for fraudulent misrepresentation against various defendants, including BRE, based on conduct occurring before the 2003 sale of Berkshire to Oakmont. Treuer Decl. Ex. P. Among other things, the third amended complaint alleges that the limited information provided by BRE about the condition of Berkshire misled Oakmont regarding the true condition of the property. Treuer Decl. Ex. Q at ¶¶ 32–34, 40; Gibbs Decl. Ex. N at ¶¶ 32–34, 40. The complaint alleges that BRE falsely represented the true history and condition of the property. *Id.* ¶ 35. Oakmont alleged that "BRE intentionally or recklessly failed to provide to Oakmont the voluminous records which documented," among other things, the

physical condition of the property. *Id.* ¶ 38. Oakmont alleged that BRE provided only limited disclosures to Oakmont with the intent that Oakmont would rely on BRE's limited disclosures to purchase Berkshire. *Id.* ¶ 40. In reliance on BRE's representations, Oakmont alleges that it purchased the property. *Id.* ¶ 39. Oakmont alleges that in 2008, it discovered extensive construction defects and property damage at Berkshire. *Id.* ¶ 29. Oakmont alleges that as a direct result of BRE's misrepresentations and failures to disclose, Oakmont has been damaged in the amount of $8,509,680, which includes the cost of repairs to the property, the cost to move and store fixtures and furniture during the repairs, costs in prosecuting an earlier construction defect lawsuit against repair contractors, the decrease in value of the property, and the lost revenue and increased expenses. *Id.* ¶ 41. The third amended complaint is still pending.

**Legal Standard**

Summary judgment shall be granted if "the pleadings, discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(c). Material facts are those which may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.* The court must view the facts in the light most favorable to the non-moving party and give it the benefit of all reasonable inferences to be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court must not weigh the evidence or de-

termine the truth of the matter, but only determine whether there is a genuine issue for trial. *Balint v. Carson City,* 180 F.3d 1047, 1054 (9th Cir.1999).

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the nonmoving party's case. *Id.* If the moving party meets its initial burden, the opposing party "may not rely merely on allegations or denials in its own pleading;" rather, it must set forth "specific facts showing a genuine issue for trial." *See* Fed.R.Civ.P. 56(e)(2); *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505. If the nonmoving party fails to show that there is a genuine issue for trial, "the moving party is entitled to judgment as a matter of law." *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548.

**Discussion**

 Liability insurance imposes on the insurer the obligation both to indemnify the insured against third party claims covered by the policy and to defend such claims against its insured by furnishing competent counsel and paying attorney's fees and costs. The duty to defend is generally determined from all the information available to the insurer when the defense is tendered, although later developments may also affect the insurer's duty to defend. *Howard v. American National*

*Fire Ins. Co.,* 187 Cal.App.4th 498, 519–520, 115 Cal.Rptr.3d 42 (2010).

 The duty to defend is broader than the duty to indemnify. The insurer must defend against a suit that potentially seeks damages within the coverage of the policy. *Hartford Cas. Ins. Co. v. Swift Distribution, Inc.,* 210 Cal.App.4th 915, 148 Cal.Rptr.3d 679, 683 (2012). The duty to defend arises when the insurer learns of facts giving rise to the potential for coverage. *New Hampshire Ins. Co. v. Ridout Roofing Co.,* 68 Cal.App.4th 495, 505, 80 Cal.Rptr.2d 286 (1998). A determination of whether the insurer owes a duty to defend is made in the first instance by comparing the allegations of the complaint with the policy terms. Facts outside the complaint may give rise to a duty to defend when they reveal a possibility that the policy may cover the claim. *Montrose Chemical Corp. v. Superior Court,* 6 Cal.4th 287, 295, 24 Cal.Rptr.2d 467, 861 P.2d 1153 (1993). "The duty to defend is determined by reference to the policy, the complaint, and all facts known to the insurer from any source." *Id.* at 300, 24 Cal. Rptr.2d 467, 861 P.2d 1153.

 The duty to defend is broad, but not unlimited. *Hartford,* 148 Cal.Rptr.3d at 683. The nature and kinds of risks covered by the policy define its scope. *Waller v. Truck Ins. Exchange, Inc.,* 11 Cal.4th 1, 19, 44 Cal.Rptr.2d 370, 900 P.2d 619 (1995). The insurer need not defend where extrinsic facts eliminate the potential for coverage despite allegations in the complaint that suggest potential liability, and where the third party complaint can by no conceivable theory raise a single issue that could bring the litigation within the policy coverage. *Waller,* 11 Cal.4th at 19, 44 Cal.Rptr.2d 370, 900 P.2d 619; *Montrose Chemical,* 6 Cal.4th at 300, 24 Cal.Rptr.2d 467, 861 P.2d 1153.

■ In an action seeking declaratory relief on the issue of an insurer's duty to defend, the insured must prove the existence of a potential for coverage, i.e. that the policy may provide coverage of the underlying claim. *Montrose Chemical,* 6 Cal.4th at 300, 24 Cal.Rptr.2d 467, 861 P.2d 1153. The insurer, by contrast, must establish the absence of a potential for coverage; it must prove that the policy cannot provide coverage of the underlying claim. *Montrose Chemical,* 6 Cal.4th at 300, 24 Cal.Rptr.2d 467, 861 P.2d 1153.

**Plaintiff's Motion for Summary Judgment against Defendant BRE Properties and Defendant BRE Properties' Motion for Summary Judgment against Plaintiff**

**1. Choice of law**

■ In an ordinary diversity action, a federal court applies the law of the forum where the Court is located. *See Ins. of N. Am. v. Federal Express Corp.,* 189 F.3d 914, 919 (9th Cir.1999). In California, "when there is no advance agreement on applicable law, but the action involves the claims of residents from outside California, the trial court may analyze the governmental interests of the various jurisdictions involved to select the most appropriate law." *Washington Mutual Bank, FA v. Superior Court,* 24 Cal.4th 906, 915, 103 Cal.Rptr.2d 320, 15 P.3d 1071 (2001). The government interest analysis has three steps: (1) "the foreign law proponent must identify the applicable rule of law in each potentially concerned state and must show it materially differs from the law of California;" (2) if the court finds the laws are materially different, the court "must proceed to the second step and determine what interest, if any, each state has in having its own law applied to the case"; and (3) "Only if the trial court determines that the laws are materially different and that each state has an inter-

est in having its own law applied, thus reflecting an actual conflict, must the court take the final step and select the law of the state whose interests would be "more impaired" if its law were not applied." *Id.* at 919–20, 103 Cal.Rptr.2d 320, 15 P.3d 1071 ("[G]enerally speaking the forum will apply its own rule of decision unless a party litigant timely invokes the law of a foreign state. In such event [that party] must demonstrate that the latter rule of decision will further the interest of the foreign state and therefore that it is an appropriate one for the forum to apply to the case before it.") (internal citations omitted).

■ Neither party has pointed to a material conflict between California and Oregon law that would trigger the application of the government interest test. In fact, Plaintiff argues that both California and Oregon law apply to this case because there is no conflict between those states' laws. *See, e.g., Downey Venture v. LMI Ins. Co.,* 66 Cal.App.4th 478, 514, 78 Cal. Rptr.2d 142 (1998) ("A liability insurance policy issued on a nationwide basis may be construed in accordance with the law of the jurisdiction in which a particular claim arises."). However, Plaintiff cites no authority for its argument that both states' laws apply where there is no conflict. Instead, where there is no application of California's choice of law rules, the law of the forum state applies. Accordingly, California law applies in this case.

**2. Exclusion j(1) applies to the underlying claim in the *Oakmont* action**

■ Plaintiff's policies contain exclusion j(1):

This insurance does not apply to:

. . .

j. Damage to Property

"Property damage" to:

(1) Property you own, rent or occupy;....

Treuer Decl. Ex. S at 2–3. Plaintiff argues that because BRE owned Berkshire during all three policy periods from 1999 through 2002, any damage to Berkshire during the policy periods was damage to property that BRE necessarily owned at the time and is therefore excluded from coverage under j(1). Thus, Plaintiff argues that the only reasonable interpretation of j(1) is that the exclusion applies to property damage to property " 'you own, rent or occupy' when the damage occurs." Reply at 3.

BRE argues that there is no support for Plaintiff's interpretation of j(1) and that the exclusion applies only during the period that the insured actually owns the property and can obtain coverage. Thus, BRE argues that because it no longer owns the property, j(1) does not exclude coverage. BRE further argues that because there is no California law interpreting whether the time reference in exclusion j(1) applies to property owned at the time of the alleged property damage or at the time when a claim for that property damage is made, this is a matter of first impression and the Court should reject Plaintiff's interpretation.

The purpose of an "own property" exclusion like exclusion j(1) has been described as follows:

> A primary function served by Owned or Leased Premises Exclusion (k) "is to prevent the insured from using a liability insurance policy as if it provided property insurance." Kenneth S. Abraham, *Environmental Liability Insurance Law* 163 (1991).

> It likewise insulates against "the 'moral hazard' problem where an insured has less incentive to take precaution owing to the existence of insurance." Barry R. Ostrager & Thomas R. Newman, *Handbook on Insurance Coverage Disputes*

§ 10.03[b], at 441 (8th ed.1995) (quoting *United States v. Conservation Chem. Co.*, 653 F.Supp. 152, 199 (W.D.Mo.1986) (internal quotation marks omitted)).

*Dryden Oil Co. of New England v. Travelers Indem. Co.*, 91 F.3d 278, 283 (1st Cir. 1996) (coverage precluded by "owned or leased property" exclusion even though insured no longer owned or leased the property); *Morrone v. Harleysville Mut. Ins. Co.*, 283 N.J.Super. 411, 662 A.2d 562, 565 (Ct.App.Div.1995) (same). More specifically, Plaintiff argues that *Martin v. State Farm Fire and Cas. Co.*, 146 Or.App. 270, 932 P.2d 1207 (1997), an environmental contamination case, supports the argument that the own property exclusion applies whenever a claim asserts property damage to property owned by the insured during the policy period. In *Martin*, the umbrella insurance policy excluded from coverage property damage to "your own property." *Martin*, 146 Or.App. at 275, 932 P.2d 1207. The plaintiff there argued that the contamination occurred before he became an owner of the property and that he later sold the property before the underlying lawsuit was filed, so the discharge occurred at the property of others and the own property exclusion did not apply to preclude coverage. The court disagreed and held that the own property exclusion applied to preclude coverage for damages from contamination of property that the plaintiff once owned, even though the plaintiff no longer owned the property, where the plaintiff's liability arose out of his status as former owner of the property. *Martin*, 146 Or. App. at 278, 932 P.2d 1207.

BRE does not substantively address *Martin*, except to argue that the case concerned a different exclusion and different policy language. These distinctions are not material. Here, the exclusion applies to property damage to "property you own," which is substantively similar to the policy language in *Martin*, which was "to

your own property." Thus, *Martin* is instructive in this case, particularly because, as described below, policy language in other cases relied upon by the parties is more distinct from that at issue here.

Plaintiff argues that the owned property exclusion is standard in CGL policies. *See, e.g., American States Ins. Co. v. Hanson Indus.*, 873 F.Supp. 17, 23 (S.D.Tex. 1995) (exclusion for damage to "property owned or occupied by or rented to the insured"). In *American States*, another environmental cleanup case, the policy stated that the "owned property exclusion" provided that the policies did not apply "to property damage to . . . property owned or occupied by or rented to the insured." The exclusion precluded coverage for the costs of cleaning up contamination that is limited exclusively to the policyholder's property. *See American States*, 873 F.Supp. at 24. The court stated that: "The purpose of the exclusion is to effectuate the intent that '[l]iability insurance is designed to provide compensation for damages to property not owned or controlled by the insured.'" *American States*, 873 F.Supp. at 24 (internal citation omitted). The court concluded that coverage for groundwater contamination was barred by the owned property exclusion because the property damage alleged in the underlying petitions was specifically limited to contamination at the site. *American States*, 873 F.Supp. at 24; *see also Morrone v. Harleysville Mut. Ins. Co.*, 283 N.J.Super. 411, 418, 662 A.2d 562 (App.Div.1995) (exclusion provided that coverage did not apply to "property damage to property owned . . . by the insured . . . .," and the court held, at least as to the soil contamination claim, that the fact that the plaintiff no longer owned the property did not prevent application of the "owned property" exclusion).

BRE's primary argument is that exclusion j(1) is written in the present tense so

the cases cited by Plaintiff involving exclusions in the past tense like those above are not applicable. BRE concludes that because the present tense is used in Plaintiff's policies, and BRE does not own the property, the exclusion does not apply. BRE relies on *AIU Ins. Co. v. Superior Court*, 51 Cal.3d 807, 821–22, 274 Cal.Rptr. 820, 799 P.2d 1253 (1990):

> Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. (Civ. Code, § 1636.) Such intent is to be inferred, if possible, solely from the written provisions of the contract. (*Id.*, § 1639.) The "clear and explicit" meaning of these provisions, interpreted in their "ordinary and popular sense," unless "used by the parties in a technical sense or a special meaning is given to them by usage" (*id.*, § 1644), controls judicial interpretation.(*Id.*, § 1638.)(1) Thus, if the meaning a lay person would ascribe to contract language is not ambiguous, we apply that meaning. (*See, e.g., Reserve Insurance Co. v. Pisciotta* (1982) 30 Cal.3d 800, 807 [180 Cal.Rptr. 628, 640 P.2d 764]; *Crane v. State Farm Fire & Cas. Co.* (1971) 5 Cal.3d 112, 115 [95 Cal.Rptr. 513, 485 P.2d 1129, 48 A.L.R.3d 1089].)

> If there is ambiguity, however, it is resolved by interpreting the ambiguous provisions in the sense the promisor (i.e., the insurer) believed the promisee understood them at the time of formation. (Civ.Code, § 1649.) If application of this rule does not eliminate the ambiguity, ambiguous language is construed against the party who caused the uncertainty to exist. (*Id.*, § 1654.)(2a) In the insurance context, we generally resolve ambiguities in favor of coverage. (*See, e.g., State Farm Mut. Auto. Ins. Co. v. Jacober* (1973) 10 Cal.3d 193, 197 [110 Cal.Rptr. 1, 514 P.2d 953]; *Bareno v.*

*Employers Life Ins. Co.* (1972) 7 Cal.3d 875, 878 [103 Cal.Rptr. 865, 500 P.2d 889]; *Continental Casualty Co. v. Phoenix Constr. Co.* (1956) 46 Cal.2d 423, 437 [296 P.2d 801, 57 A.L.R.2d 914].)(3)(*See* fn. 8.), (2b) Similarly, we generally interpret the coverage clauses of insurance policies broadly, protecting the objectively reasonable expectations of the insured. (*See, e.g., Garvey v. State Farm Fire & Casualty Co.* (1989) 48 Cal.3d 395, 406 [257 Cal.Rptr. 292, 770 P.2d 704]; *Reserve Insurance Co. v. Pisciotta, supra,* 30 Cal.3d at p. 808 [180 Cal. Rptr. 628, 640 P.2d 764].) These rules stem from the fact that the insurer typically drafts policy language, leaving the insured little or no meaningful opportunity or ability to bargain for modifications. (*See, e.g., Garcia v. Truck Ins. Exchange* (1984) 36 Cal.3d 426, 438 [204 Cal.Rptr. 435, 682 P.2d 1100]; *Bareno, supra,* 7 Cal.3d at p. 878 [103 Cal.Rptr. 865, 500 P.2d 889].) Because the insurer writes the policy, it is held "responsible" for ambiguous policy language, which is therefore construed in favor of coverage.

*AIU,* 51 Cal.3d at 821–22, 274 Cal.Rptr. 820, 799 P.2d 1253.

BRE argues that to interpret "own" as "owned" would violate the plain meaning of the policy. BRE also argues that applying the exclusion would not comport with the objectively reasonable expectations of BRE and would create a gap in coverage. BRE argues that when an insured buys a CGL policy, it expects broad protection against third-party claims for property damage. BRE argues that while the insured owns the property, it does not need that coverage because it has available property coverage through first-party property insurance. Thus, BRE agrees that the purpose of exclusion j(1) is to avoid redundant coverage. *See, e.g.,* Turner, *Insurance Coverage of Construction Disputes,* § 14.1, Page 14-2 (2012) ("The

insurer's purpose for these property owned exclusions is to avoid redundant coverage. The various property policies available to the insured, e.g., fire insurance, inland marine policies, etc., were intended to cover these losses."); *State Farm Fire & Cas. Co. v. English Cove Assoc., Inc.,* 121 Wash.App. 358, 360–61, 88 P.3d 986 (Wash.App.2004) ("An 'owned property' exclusion is intended to prevent a general liability policy from providing first-party benefits to the insured."). BRE argues that once property is sold, however, a former owner cannot obtain first-party property insurance (Cal. Ins. Code §§ 280, 286), and that a subsequent CGL policy, which only covers property damage during the term of the policy, would not cover construction defect claims by subsequent owners. Thus, BRE argues that its objectively reasonable expectation was that the CGL policy with Plaintiff covered all third-party claims after a sale. Plaintiff, however, counters that there is no need for exclusion j(1) to exclude first party losses that are not covered under a liability policy; rather, exclusion j(1) specifically precludes an insured from transforming a liability policy into a first party policy by selling the property, getting sued, and expecting an insurer to cover the damage.

Finally, BRE argues that any ambiguity as to the time reference in exclusion j(1) should be construed against Plaintiff, so that the exclusion would not bar coverage. *See MacKinnon v. Truck Ins. Exchange,* 31 Cal.4th 635, 648, 3 Cal.Rptr.3d 228, 73 P.3d 1205 (2003) (coverage should be interpreted broadly to afford the greatest possible protection to the insured).

■ BRE's present tense argument is not well-taken. Under California law, a contract must be interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting,

insofar as the same is ascertainable and lawful. *St. Paul Mercury Ins. Co. v. Frontier Pacific Ins. Co.*, 111 Cal.App.4th 1234, 1243, 4 Cal.Rptr.3d 416 (2003). The purpose of insurance is to insure against uncertain future risks. Thus, at the time of contracting, the risk of damage is in the future, so the present tense of the exclusion refers to a time after the time of contracting. Thus, "damage to property you own" refers to damage to property the insured owns when the damage occurs at some future time after purchase of the policy.

Further, "property owned by you," which is used in some of the cases cited by Plaintiff, is not in the past tense as argued by BRE, but is instead in the passive voice. *See Lennar Corp. v. Great American Ins. Co.*, 200 S.W.3d 651, 692 (Tex. App.2006) ("Exclusion B(6)(a) excludes coverage for damage to 'property you own, rent, or occupy.' ... Despite Exclusion B(6)(a), we read Endorsement 2 in the present tense. Clearly, the words 'occupied by, used by, or owned by,' instead of 'occupy, use, or own,' are included because Endorsement 2 is in the passive voice—not because Endorsement 2 refers to the past tense."). When the insurance contract is formed, no property has yet been damaged, and both "property you own" and "property owned by you" refer to property that is damaged after purchase during the policy period.

Thus, because exclusion j(1) refers to property that an insured owns when the damage occurs, the exclusion precludes coverage in this case.

### 3. Exclusion j(2) applies to the underlying claim in the *Oakmont* action

Exclusion j(2), also known as an alienated property exclusion, also applies to exclude coverage. Pursuant to Plaintiff's policies, exclusion j(2) states:

This insurance does not apply to:

...

j. Damage to Property
"Property damage" to:

...

(2) Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

...

Paragraph (2) of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Treuer Decl. Ex. S at 2–3.

■ Exclusion j(2) operates to deny coverage to an insured that either occupies the property or holds it for rent by others and then sells it without disclosing property damage to the buyer. *Prudential–LMI Commercial Ins. Co. v. Reliance Ins. Co.*, 22 Cal.App.4th 1508, 1512, 27 Cal.Rptr.2d 841 (1994) (stating that the intent of an alienated premises exclusion is to "deny coverage to an insured who has failed to repair property prior to its sale or who has failed to disclose the existence of a defect in the premises at the time of sale.") (internal citation omitted). Courts have held that the exclusion precluded coverage in cases similar to this one. *See 1777 Lafayette Partners v. Golden Gate Ins. Co.*, No. C–10–1863 RMW, 2011 WL 1630089, at *5 (N.D.Cal. April 29, 2011) ("However, courts have typically treated developers/renters as falling under alienated premises exclusions."); *Rieder v. Cherokee Ins. Co.*, 635 F.Supp. 699, 702–03 (E.D.Pa. 1986) (in an action by the owners of an apartment complex at the time of a fire seeking property damage, the developer, who did not own the property at the time of the litigation, was not entitled to coverage due to an alienated property exclusion for "property damage to premises alienated by the named insured arising out of such premises or any part thereof" because the owners were seeking to recover

property damage to the apartment complex); *Liberty Bldg. Co. v. Royal Indem. Co.*, 177 Cal.App.2d 583, 588, 2 Cal.Rptr. 329 (1960) (finding no coverage under alienated property exclusion for property damage claims where property was owned by the insured during policy period and alienated by the insured after the policy period).

█ BRE argues that there is a disputed issue of fact as to whether Plaintiff and BRE agreed to delete exclusion j(2) from the policies altogether. During the renewal process for BRE's policies, BRE's insurance broker, Marsh USA, provided Plaintiff with BRE's "General Liability Specification" setting forth BRE's requirements for insurance coverage, including the deletion of exclusion j(2). Bauer Decl. ¶ 2, Ex. A at 8. BRE's counsel states that there was no indication in Plaintiff's underwriting file that Plaintiff rejected the requirement, which BRE took as Plaintiff's assent to delete exclusion j(2). Bauer Decl. ¶ 7. BRE further points to the Marsh Insurance Summary which does not include exclusion j(2) in the list of exclusions in the policies. Bauer Decl. ¶ 6; Ex. E. However, that Insurance Summary also states that: "This document is a synopsis of coverage only; the Policy contains exclusion and/or limitations not shown here." *Id.* BRE argues that insurance policies are often issued after they are purchased, and they go unread by the insured, so it was reasonable for BRE to think that j(2) had been deleted from its policies.

Even if there was discussion about removing exclusion j(2), there is no dispute that BRE signed a policy that included that exception, and BRE was represented by Marsh USA, which is one of the world's leading insurance brokers. BRE could not reasonably assume that an unanswered request to delete a key provision from the policies would be granted. Therefore, there is no triable issue of material fact.

█ BRE argues that exclusion j(2) does not apply because BRE purchased broad form completed operations coverage for the precise purpose of protecting itself against construction defect claims by a subsequent buyer of its projects. The policies in this case show that Plaintiff provided "Products–Completed Operations" insurance with an aggregate limit of $2 million. *See, e.g.,* Treuer Decl. Ex. S at 4. The policies define "Products-completed operations hazard" in relevant part as:

> Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except . . . . [exceptions not applicable].

Treuer Decl. Ex. S at 11.

BRE argues that "as to an owner like BRE who purchases this coverage, the 'away' from premises means that the coverage applies to 'premises' it sells, and thus no longer owns or rents." Opp. at 6. BRE further explains that exclusion *l* of the policy, entitled "Damage to Your Work," demonstrates that the products-completed operations coverage was intended to and did apply to construction defects. Exclusion *l* excludes property damage to "'your work' arising out of it or any part of it and included in the 'products-completed operations hazard,'" but also provides that: "This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor." Treuer Decl. Ex. S at 3. BRE argues that this carveout from the exclusion, extending coverage to work by subcontractors, is the broad form coverage. From this conclusion, BRE argues that broad form with completed operations coverage protects the insured owner from third-party claims for property damage arising from work by subcontractors, i.e., construction defects, after the owner sells the property. Opp. at 7. BRE states

that coverage for claims by third parties for damages arising out of construction work that was performed by BRE's subcontractors that arose after completion of the construction operations and the sale of the property is at the heart of BRE's reasonable expectations for coverage, and otherwise, there would be no reason to have the Products–Completed Operations coverage.

The Court is not persuaded. BRE's interpretation of "away from premises you own" as meaning premises that are sold is not well-taken. BRE has provided no authority to support its interpretation. The plain language of the term "away from" refers to damage that occurs somewhere else, meaning not on the property. The carve-out does not alter this basic fact.

■■■ BRE also argues that because it is in the "business of ... selling apartment communities," it reasonably expected coverage for claims excluded by j(2). Plaintiff counters that the exception to exclusion j(2) protects the reasonable expectations of developers who, unlike BRE, do not occupy or rent out newly-built property before it is sold; because the exception does not apply to BRE, application of the exclusion could not violate its reasonable expectations. In any case, unless a provision in an agreement is ambiguous, the insured's expectations are not relevant. *See Hallmark Ins. Co. v. Superior Court,* 201 Cal. App.3d 1014, 1019, 247 Cal.Rptr. 638 (1988) ("The doctrine of reasonable expectation of coverage is applicable only where the language of the policy if ambiguous."). Reasonable expectations cannot be invoked to create an ambiguity where none exists. *Lee v. Fidelity Nat'l Title Ins. Co.,* 188 Cal.App.4th 583, 597, 115 Cal.Rptr.3d 748 (2010) ("We recognize the principle that an insured's '... objectively reasonable expectations may be considered to resolve an ambiguous policy provision ... but cannot be relied upon to create an ambiguity

where none exists.'") (internal citation omitted). This provision is not ambiguous, so BRE's expectations are not relevant.

BRE's final argument against application of exclusion j(2) is that under California law, courts decline to apply exclusion j(2) under the circumstances here. BRE argues that *Maryland Casualty Co. v. Reeder,* 221 Cal.App.3d 961, 270 Cal.Rptr. 719 (1990) and *Prudential–LMI Commercial Ins. Co. v. Reliance Ins. Co.,* 22 Cal. App.4th 1508, 27 Cal.Rptr.2d 841 (1994) are identical to the present case in all material respects. The *Maryland Casualty* and *Prudential* courts rejected exclusions like j(2) and found coverage in favor of the owners. *See Maryland Casualty,* 221 Cal.App.3d at 977, 270 Cal.Rptr. 719 (finding that coverage was not excluded for entity that conveyed the property after insurance policies were issued and after construction was completed: "Given the impact the 1982 FC & S interpretation has on coverage provided by a broad form endorsement, we are inclined to agree. Having paid an additional premium for broad form coverage, we believe an insured developer would expect to receive coverage of some additional risk. Accordingly we decline to apply the exclusion to Twelve Trees."); *Prudential,* 22 Cal. App.4th at 1511, 27 Cal.Rptr.2d 841 (affirming the ruling in *Maryland Casualty* that in the face of broad form completed operations coverage, the alienated premises exclusion should be disregarded).

BRE argues that under *Prudential's* ultimate test for determining whether an exclusion precludes coverage, BRE had a reasonable expectation of coverage, so exclusion j(2) does not apply. *See Prudential,* 22 Cal.App.4th at 1513, 27 Cal.Rptr.2d 841 ("As we implied in *Maryland Casualty Co. v. Reeder, supra,* 221 Cal.App.3d 961, 270 Cal.Rptr. 719, insurance industry publications are particularly persuasive as inter-

pretive aids where they support coverage on behalf of the insured. Ultimately, the test is whether coverage is 'consistent with the insured's objectively reasonable expectations.'"). But BRE's argument that *Prudential* set forth the ultimate test rests on its belief that it purchased broad form completed operations coverage, whereas it appears that no such specific endorsement was purchased here.

Further, BRE is not in the same position as the insureds in *Maryland Casualty* and *Prudential*. Unlike the insureds in those case, the exception to exclusion j(2) applies here because there is no dispute that BRE rented Berkshire. By contrast, in *Maryland Casualty*, the insured that owned the property had never occupied the premises or rented it out. Thus, the *Maryland Casualty* court did not apply the alienated premises exception to a developer which never rented out the premises but simply built them for immediate sale, unlike BRE. Similarly, in *Prudential*, the insured never occupied the premises or held it out for rent. Here, because BRE rented out Berkshire before selling it, coverage is excluded under exclusion j(2).

**4. Alternatively, coverage is precluded because the policies do not apply to the single misrepresentation claim in the underlying *Oakmont* case**

As a fallback position, Plaintiff argues that the misrepresentation claim is not covered by the policies because: (1) it does not arise out of an occurrence; (2) it is for economic damage, not property damage; and (3) the alleged misrepresentation took place after the last policy expired. Lexington makes similar arguments as addressed below. Thus, even if the exclusions did not preclude coverage, the only claim in the third amended complaint in the *Oakmont* case is not covered.

 BRE relies on the broad duty to defend under state law. BRE argues that

Plaintiff has not shown that the claims cannot fall within coverage. *Montrose Chemical*, 6 Cal.4th at 300, 24 Cal.Rptr.2d 467, 861 P.2d 1153 (stating that the insurer must establish the absence of a potential for coverage; it must prove that the policy cannot provide coverage of the underlying claim). Labels given to claims are not dispositive. *See Travelers Property Casualty Co. of America v. Charlotte Russe Holding, Inc.*, 207 Cal.App.4th 969, 976, 144 Cal.Rptr.3d 12 (2012).

In particular, BRE points to allegations in the 2010 Oakmont complaint that are broad enough to support other possible theories such as negligence. For example, BRE notes that Oakmont alleged that BRE made extensive repair work on the siding and decks at Berkshire. Treuer Decl. Ex. L at ¶ 5. BRE notes that Oakmont alleged that BRE misled Oakmont to believe that all construction defects had been repaired, which BRE argues is essentially an allegation of defective repair work. *Id.* ¶ 9. BRE also points to extrinsic facts such as Oakmont's 2008 lawsuit and the ABC lawsuit, which contained specific allegations of negligence. However, the state court has specifically dismissed the negligence claims in the state court case.

Plaintiff points out that the policies here specifically state that Plaintiff has no duty to defend. The Self-Insured Retention Endorsement contained in the policies states in relevant part:

This endorsement changes your commercial general liability coverage form and accompanying endorsements and imposes various obligations and duties upon you.

1. Each and every insurance coverage that is identified in the Insurance Coverages Affected box above is hereby modified by the following:

. . .

F. *We have no duty to defend any claim or "suit," but we shall have the right and you shall avail us the opportunity to associate with the insured in the defense of any claim or "suit" which, in our sole opinion, may create indemnification obligations for us under this Policy.*

. . . .

Treuer Decl. Ex. S at 34–35 (emphasis added).

■ BRE argues that the policies are internally inconsistent because paragraph 1(a) of Plaintiff's Insuring Agreement provides: "We have the right and duty to defend the insured against any suit" seeking damages for property damage (Treuer Decl. Ex. S at 5), yet the Self–Insured Retention Endorsement states otherwise. The endorsement, however, clearly states that it modifies the CGL policy. Coverage may be limited by an endorsement, and if a conflict exists between the main body of the policy and an endorsement, the endorsement prevails. *See Aerojet–General Corp. v. Transport Indemnity Co.,* 17 Cal.4th 38, 50, n. 4, 70 Cal.Rptr.2d 118, 948 P.2d 909 (1997) (" '[I]f there is a conflict in meaning between an endorsement and the body of the policy, the endorsement controls.' ") (internal citation omitted).

■ It appears from the plain language of the policies that Plaintiff does not have a duty to defend, but instead may have a duty to indemnify BRE, once coverage is found, for claim expenses (that include legal expenses and litigation costs) that are in excess of the self-insured retention amount and are reasonable in amount and directly allocated to a specific claim. The standard for a duty to defend does not apply to a duty to indemnify. *See Pan Pacific Retail Properties, Inc. v. Gulf Ins. Co.,* 471 F.3d 961, 970–71 (9th Cir.2006) ("Those cases, which involved an insurer's duty to provide contemporaneous advancement of defense costs, are not controlling where the insureds only seek reimbursement of costs after the underlying litigation has ended.") (internal citation omitted).

Even assuming that Plaintiff's duty to indemnify is triggered, the misrepresentation claim does not fall within the policy.

**A. The misrepresentation claim is not an occurrence covered under the policies**

■ The policies provide coverage for bodily injury and property damage only if the injury or damage is caused by an occurrence, which is defined in the policy as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Treuer Decl. Ex. S at 15. A misrepresentation is not an accident, and so it does not fall within the policy's definition of an occurrence. *See Martin v. State Farm Fire and Cas. Co.,* 146 Or.App. 270, 932 P.2d 1207 (Or.Ct.App.1997); *Ray v. Valley Forge Ins. Co.,* 77 Cal.App.4th 1039, 1045–46, 92 Cal.Rptr.2d 473 (1999) ("Under the policy, an occurrence requires 'an accident.' Although the term 'accident' is not defined in the policy, courts have consistently defined the term to require unintentional acts or conduct."); *Miller v. Western General Agency, Inc.,* 41 Cal.App.4th 1144, 1150, 49 Cal.Rptr.2d 55 (1996) ("Since insurance is designed to protect against contingent or unknown risks of harm, rather than harm that is certain or expected [citation], it is well settled that intentional or fraudulent acts are deemed purposeful rather than accidental and, therefore, are not covered under a [liability] policy [citations].") (internal citation omitted). BRE does not argue otherwise and concedes that a misrepresentation is not an occurrence. Opp. at 22; *see also Warner v. Fire Ins. Exch.,* 230 Cal.App.3d 1029, 1035, 281 Cal.Rptr. 635 (1991) ("Claims predicat-

ed on negligent and intentional fraudulent misrepresentations were also held not to be covered under a liability policy for personal injury or property damage....").

Similarly, here, Oakmont has alleged one claim for fraudulent misrepresentation based on statements made by BRE about the property. *See* Treuer Decl. Ex. N at 4, n. 3 and 6. The *Oakmont* court has already found that no negligence claim exists in this case. Although BRE argues that coverage is triggered because Oakmont is seeking damages for property damages, there is no claim for property damage in this case that could be called an occurrence.

**B. The claim for misrepresentation in this case arises out of economic damages, not property damage**

▉ Plaintiff also argues that the misrepresentation claim is not covered because it arises out of economic damages and not property damage. *See Martin,* 146 Or.App. at 280, 932 P.2d 1207 ("The damages that the plaintiffs sought in the eighth claim were not for property damage under that definition. Rather, they were for having purchased property that, because of the concealed condition, was worth less, and came with greater liabilities, than the plaintiffs anticipated."); *Warner,* 230 Cal.App.3d 1029, 1035, 281 Cal.Rptr. 635 (1991) ("Likewise, damages resulting from negligent misrepresentation made by the seller of an automobile regarding the true mileage on the odometer and absence of major mechanical defects were held only to be damage to the purchasers' 'pecuniary interests'....").

BRE argues, however, that Oakmont does not only seek economic damages, but also seeks damages to tangible property interests, specifically the costs of repair. However, in *Devin v. United Services Auto. Ass'n,* 6 Cal.App.4th 1149, 8 Cal. Rptr.2d 263 (1992), the court stated:

We first reject Devins' claim that there was a potentially covered claim for "property damage." The policy specifically limits coverage to occurrences causing property damage, and defines property damage as "physical injury to, destruction of, or loss of use of, tangible property." Where a third party's suit alleges the insured's wrongful conduct caused only economic injury, and there is no suggestion of any wrongful conduct causing injury to tangible property, the insurer does not owe a defense, there being no damage or injury to tangible property within the meaning of the policy. (*Giddings v. Industrial Indemnity Co.* (1980) 112 Cal.App.3d 213, 218–220 [169 Cal.Rptr. 278].)

Here, McNairs alleged claims for intentional and negligent misrepresentation causing a pecuniary loss-the lost fair market value of the house. Such an injury is not an injury to tangible property within the meaning of a liability policy, because damages for fraud are ordinarily limited to recovery of economic injuries (*see Stout v. Turney* (1978) 22 Cal.3d 718, 725 [150 Cal.Rptr. 637, 586 P.2d 1228]), which the courts have repeatedly held are not injuries to tangible property within the scope of coverage of a liability policy. (*See Fresno Economy Import Used Cars, Inc. v. United States Fid. & Guar. Co. Inc., supra,* 76 Cal. App.3d 272, 278–284 [142 Cal.Rptr. 681]; *Allstate Ins. Co. v. Interbank Financial Services* (1989) 215 Cal.App.3d 825, 830 [264 Cal.Rptr. 25]; *Warner v. Fire Ins. Exchange* (1991) 230 Cal.App.3d 1029, 1034–1035 [281 Cal.Rptr. 635]; *Allstate Insurance Co. v. Miller* (N.D.Cal.1990) 743 F.Supp. 723.)

*Devin,* 6 Cal.App.4th at 1158–59, 8 Cal. Rptr.2d 263. Relying on the holding of a state law case that has been rejected, BRE argues that *Devin* does not apply here because Oakmont's complaint alleges more

than just economic damages because of the cost of repair damages. *See Jares v. Ull-rich*, 266 Wis.2d 322, 667 N.W.2d 843 (Wis. App.2003) (finding a duty to defend for misrepresentation where the insured alleged damage that occurred subsequent to the sale of property), *discussed in Boggs v. Great Northern Ins. Co.*, 659 F.Supp.2d 1199, 1210 (N.D.Okla.2009) (rejecting *Jares* as contrary to the weight of authority). Further, the *Devin* court noted that the dissent improperly considered a portion of a settlement for cost of repair as damage to tangible property interests that could support coverage. *See Devin*, 6 Cal. App.4th at 1158, n. 6, 8 Cal.Rptr.2d 263.

## C. The alleged misrepresentations were outside the policy periods

██ Plaintiff also argues that BRE made its first alleged misrepresentation to Oakmont in November 2002, before the sale of the apartments in 2003. *See* Treuer Decl. Ex. Q at ¶¶ 23–28. The last policy issued by Plaintiff expired in October 31, 2002. The policies provide that they cover injury and damage occurring during the policy period. Treuer Decl. Ex. S at 5.

BRE concedes that the misrepresentation occurred outside of the policy period, but contends that coverage is triggered by the assertion of a claim for damage to property during the policy period. However, the damages here are only for economic damages, as stated above. Further, the basis for the claim, even if there was property damage, is the misrepresentation, which took place admittedly outside the policy period. Here, there are no negligence claims in this case because they have been dismissed, and the misrepresentation claim does not trigger the application of the policies. Therefore, Plaintiff has no duty to indemnify.

## 5. Conclusion

Exclusions j(1) and j(2) preclude coverage for BRE in connection with the *Oakmont* action. Further, even if the exclusions did not apply, the underlying misrepresentation claim is not covered by the policy. Accordingly, Plaintiff's motion for summary judgment is granted and BRE's motion for summary judgment is denied. Thus, Plaintiff has no equitable contribution or indemnity obligation to Lexington. *See Certain Underwriters at Lloyd's London and Excess Ins. Co. Ltd. v. Massachusetts Bonding and Ins. Co.*, 235 Or.App. 99, 114, 230 P.3d 103 (2010).

**Defendant BRE Properties' Motion for Summary Judgment against Defendant Lexington and Defendant Lexington's Motion for Summary Judgment against Defendant BRE Properties**

In its cross-claim against Lexington, BRE seeks declarations that the Lexington policies cover the Berkshire litigation, triggering Lexington's duty to defend, and that exclusions j(1) and j(2), relied upon by Lexington to deny coverage, do not apply. Lexington's policies were in effect from shortly before the sale of the Berkshire property to Oakmont until five years thereafter

The parties to these motions do not dispute that California law applies. To the extent that the parties make the same arguments as did Plaintiff and BRE in their motions above, the Court's rulings are the same. The Court will only address the additional arguments made by Lexington and BRE in these motions.

## 1. Exclusion j(1) applies to the underlying claim in the *Oakmont* action

Exclusion j(1) from the Lexington policies is the same as the exclusion from Plaintiff's policies:

This insurance does not apply to:

. . .

j. Damage to Property

"Property damage" to:

(1) Property you own, rent or occupy; . . . .

Wodnik Decl. Ex. G at 4. As the Court concluded above with respect to Plaintiff's identical policy language, this exclusion applies to BRE's ownership of the Berkshire property during the time that Lexington insured BRE, from October 31, 2002 through February 18, 2003. However, in Lexington's case, this exclusion does not apply to the Lexington policy periods from February 18, 2003 through October 31, 2008.

**2. Exclusion j(2) applies to the underlying claim in the *Oakmont* action with respect to the policies issued after BRE sold Berkshire**

██ Exclusion j(2) from the Lexington policies is the same as the exclusion from Plaintiff's policies:

This insurance does not apply to:

. . .

j. Damage to Property

"Property damage" to:

(2) Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

. . .

Paragraph (2) of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Wodnik Decl. Ex. G at 4. To the extent that BRE makes the same arguments here in connection with this exclusion as it did in cross-motion with Plaintiff, the Court's rulings are the same.

BRE raises one argument specific to Lexington, that is, that under *Prudential*, an insured who sells property before purchasing an insurance policy is a "nonowner" of that property for purposes of that policy, and as a "nonowner," exclusion j(2), which excludes coverage for property damage for property "you sell, give away or abandon," does not apply at all. According to BRE, because it sold the property on February 18, 2003, it is a "nonowner" as to the Lexington policies issued after that sale, rendering exclusion j(2) inapplicable as to Lexington for those policies.

In explaining the *Maryland Casualty Co.* case, the *Prudential* court stated: "We went on to explain that the exclusion should not affect coverage as to an insured who sold his interest before issuance of the policy and was thus a nonowner at all times during the policy period." *Prudential*, 22 Cal.App.4th at 1511, 27 Cal.Rptr.2d 841. Lexington argues that this language applies to a specific set of facts at issue in *Maryland Casualty Co.* and is distinguishable from this case. The analysis in *Maryland Casualty Co.* appears to rely on the finding in that case that applying the exclusion where the insured formerly owned the property as undeveloped land before construction commenced, and where it had sold its entire interest before the issuance of the property, would render the policy illusory. *See Maryland Casualty Co.*, 221 Cal.App.3d at 978, 270 Cal.Rptr. 719 (relying on the fact that the purpose of the policy was solely to protect against risks associated with a particular alienated property: "Given these circumstances application of the exclusion to Pearlman's prepolicy and preconstruction conveyance would likely render the policy illusory as to him. If his 1979 conveyance would defeat any coverage for the condominium project, it is difficult to understand why commencing in 1980 Maryland sold him a series of liability policies when there is no indication in the record Pearlman was involved in any other construction project."). The *Maryland Casualty Co.* court distinguished *Rieder v. Cherokee Ins. Co:* "In *Rieder*, the court upheld application of the alienated premis-

es exclusion where conveyance of a completed apartment project occurred before the subject policy was issued. Unlike the situation here, however, in *Rieder* there is no indication the insured was seeking protection solely for the very project which it had previously conveyed." *Maryland Casualty Co.,* 221 Cal.App.3d at 978, n. 6, 270 Cal.Rptr. 719. Thus, the concern about illusory coverage played a key role in *Maryland Casualty Co.'s* decision, as explained by *Prudential.*

Here, as in *Rieder,* there has been no showing that BRE sought protection from the Lexington policies solely for the Berkshire property. The policies are general liability policies and are not tied to any one property. Lexington notes that BRE is in the business of real estate and handles many different properties. Further, as stated at the hearing, the policies covered, among other things, bodily injury and advertising injury, so even if there was no coverage for claims made after selling the property, the entire policies were not illusory. In *Maryland Casualty* and *1777 Lafayette,* coverage was found at least in part because if it had been excluded, the policies at issue would have been illusory. Here, however, because the policies were not limited to only the Berkshire property, enforcement of exclusion j(2) would not render the policy illusory.

BRE, however, argues that the question is not whether the entire policy is illusory as argued by Lexington and Plaintiff, but whether the broad form coverage would be rendered illusory. BRE argues that coverage was illusory because the completed operations coverage was specifically intended to protect an owner after sale of property from construction defect claims that arise or relate to work performed by others. BRE takes an unduly narrow view of illusory coverage that is not supported by the case law. The Court concludes that because the policies were not

limited to coverage of the Berkshire property only, exclusion of coverage in this case would not render the entire policies illusory.

### 3. The policies do not apply to the misrepresentation claim

Lexington argues that the misrepresentation claim is not covered by the policies because: (1) it does not arise out of an occurrence; and (2) it is for economic damage, not property damage, that took place outside the policy period. To the extent that the arguments are the same as those made above with respect to Plaintiff's policies, the rulings are the same.

BRE also argues that Lexington conceded coverage in a letter dated April 23, 2010. Gibbs Decl. Ex. V. Lexington stated: "The purpose of this letter is to confirm the liability coverage afforded BRE." *Id.* BRE notes that Lexington did not mention exclusion j in the letter and only asked BRE to keep Lexington informed of the progress of the litigation. However, the fact that Lexington did not mention exclusion j in that letter is not dispositive because the letter is not a comprehensive letter about coverage. Further, the letter expressly states that it was not to be construed as a waiver of any terms in the policy. BRE's argument regarding a concession by Lexington regarding coverage is not well-taken. The Court need not reach Lexington's argument that the definition of "occurrence" in its policies is deemed to take place only when the event first commenced. *See* Gibbs Decl. Ex. O at 187.

### Conclusion

Exclusions j(1) and j(2) preclude coverage for BRE in connection with the *Oakmont* action. Further, even if the exclusions did not apply, the underlying misrepresentation claim is not covered

by the policies. In addition, because coverage is excluded, the Court need not reach Lexington's argument regarding the known loss rule. Accordingly, Lexington's motion for summary judgment is granted and BRE's motion for summary judgment is denied.

IT IS SO ORDERED.